***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Donovan and the briefs and arguments of the parties. The appealing party has shown good ground to reconsider the evidence. Accordingly, the Full Commission reverses the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission and the North Carolina Industrial Commission has jurisdiction of the parties and the subject matter of this action.
2. All parties have been correctly designated and there is no question as to misjoinder or nonjoinder of parties.
3. On or about September 14, 2006, defendant-employer employed more than three employees and it and its employees were bound by and subject to the provisions of the North Carolina Workers' Compensation Act, North Carolina General Statute's Chapter 97.
4. On or about September 14, 2006, there existed between plaintiff and defendant-employer an employee-employer relationship.
5. On or about September 14, 2006, defendant-employer was insured for workers' compensation claims through North Carolina League of Municipalities.
6. On or about September 14, 2006, plaintiff was employed by defendant-employer at an average weekly wage of $831.75, yielding a compensation rate of $554.50 per week, as stipulated by the parties on April 21, 2008.
7. On or about September 14, 2006, plaintiff alleges she sustained an occupational disease arising out of and in the course of her employment with defendant-employer, said accident resulting in an injury to her sinuses, nose and respiratory system.
8. Mold was present in the building where plaintiff worked at least as far back as 1996 through what the current studies show.
9. In addition, the parties stipulated to the following medical records:
 a. Carolina Otolaryngology Consultants, PA; Bennie L. Jarvis, M.D. 10/14/2006-11/28/2007 (24 pages);
 b. Rocky Mount Family Medical Center; Dr. John Hart, M.D. 03/13/2007-07/17/2007 (9 pages);
 c. Nash Urgent Care; 09/14/2006 (2 pages).
10. Subsequent to the hearing, the parties entered the following stipulations:
 a. Jamie Baines removed a piece of sheetrock material from the office wall of the Town Hall building of the Town of Nashville and identified by a star on the Town Hall Floor plan as Exhibit A in September 2006.
 b. Jamie Baines placed that same sheet rock material in a plastic bag and delivered it to Cynthia Brake within minutes after it's removal.
 c. The same sheetrock material referenced above was tested in Florida by The EnviroScreening Lab, 3665 E. Bay Drive #204, PMB 428, Largo, Florida 33771 on February 8, 2008. (Exhibit B).
 d. This is the same sheetrock material that was referenced in the report by Andy Shankle dated February 14, 2008. (Exhibit B).
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. On July 18, 2007, plaintiff filed a Form 18 claiming that she suffered an injury to her sinuses as a result of exposure to mold, mildew and asbestos.
2. Plaintiff, a high school graduate who has taken some college courses, was 45 years old at the time of the evidentiary hearing. She is currently employed as the Town Clerk of Nashville, North Carolina, and also has some human resources responsibilities. Plaintiff has worked in various positions for the Town of Nashville since 1985.
3. Plaintiff contends that approximately eight years ago, she developed sinus problems with headaches, asthmatic symptoms, wheezing and congestion. However, plaintiff did not see a doctor for these problems until September 2006.
4. Plaintiff's office was relocated in the Nashville Town Hall in September 2006. Plaintiff testified that she last observed what she believed to be mold in the Town Hall in September 2006.
5. Plaintiff has lived in her current residence since April 2000, where she resides with her husband, daughter and dog.
6. Plaintiff first saw Dr. Bennie Jarvis on October 4, 2006 at which time she reported having nasal symptoms at work. Dr. Javis noted that plaintiff's past medical history included weight gain, asthma, acid reflux and that plaintiff was currently overweight. Plaintiff also reported to Dr. Jarvis that there was "frank mold" growing in her office. Dr. Jarvis determined that plaintiff had a deviated septum, which she later indicated plaintiff was probably born with; hypertrophic turbinates or swelling in her nose; headaches and rhinitis; and sleep apnea which Dr. Jarvis attributed to plaintiff's large size, tongue base, and tonsils.
7. Plaintiff did not seek medical treatment at all between November 2006 and August 2007. In August 2007, plaintiff erroneously reported to Dr. Jarvis that there was visible mold growing in her office. On August 23 and November 19, 2007, plaintiff underwent procedures designed to shrink her nasal turbinates. In March 2008, plaintiff also underwent a surgical procedure to correct her deviated septum and remove a portion of her turbinate tissue. Plaintiff testified that she missed approximately 20 days of work due to her nasal symptoms. However, Dr. Jarvis' records and testimony reflect that plaintiff was only taken out of work from August 23 to September 4, 2007 and that she will not have any permanent pain or deformity as a result of these procedures.
8. Plaintiff also saw Dr. Gurvinter Deogun, a board certified allergist, on February 27, 2008. This was the only time plaintiff was evaluated by Dr. Deogun. On that date, plaintiff complained of chronic nasal congestion, wheezing, changes in her voice, a metal-like taste in her mouth and coughing. Dr. Deogun observed that plaintiff had "bogginess" and swelling of her nasal turbinates and diagnosed plaintiff with allergic rhinitis due to chronic mold exposure, based on plaintiff's subjective alleged report that there was mold in her workplace. However, skin testing performed by Dr. Deogun revealed that plaintiff had no allergy to mold species Cladosporium and no definitive mold allergy to mold species Penicillium. Dr. Deogun later testified that plaintiff's acid reflux, her allergy to ash trees and potential allergy to animal dander could be causing her symptoms.
9. At defendants' request, Dr. Jerry Tulis evaluated the air quality in and around the Nashville Town Hall. Dr. Tulis is an expert in the field of occupational and environmental medicine, with a Ph.D. in the field of radiation biology, microbiology and physiology and currently works as a consultant and as a professor at Duke University. Dr. Tulis has also worked in the past for multiple governmental agencies, testified before Congress and lectured across the country and internationally on issues concerning indoor air quality.
10. Dr. Tulis collected 15 samples in multiple locations inside the Town Hall and two samples outside. Based on the results of his testing, Dr. Tulis indicated that the concentration of mold spores outside the Town Hall was four times greater than inside. Dr. Tulis also indicated that the mold species Aspergillus, which is most closely associated with human health effects, was not detected inside the Town Hall. Based on the results of his testing, Dr. Tulis is of the opinion that the air quality inside the Town Hall is acceptable for occupancy.
11. Architect Ann Collier was hired by the Town of Nashville to conduct a feasibility study in 2004 to evaluate the use of the Town's facilities. Ms. Collier testified that during a tour of Town Hall she observed a black substance which she suspected was mold, but admitted that she was not an environmental engineer. Ms. Collier also testified that she does not feel qualified to answer questions regarding the health effects of mold.
12. Plaintiff retained Steven McLeod to facilitate testing of the air quality in the Town Hall. Mr. McLeod does not have a bachelor's degree in any scientific field or any post-graduate training. In addition, most of the certifications he obtained which may be relevant to the area of indoor air quality have lapsed. Mr. McLeod is in the business of providing indoor air quality services and product sales and in 90% of the cases in which he evaluates air quality, product sales are also involved. Mr. McLeod only took one air sample from inside the Town Hall, but not from plaintiff's current office and one outdoor air sample. Mr. McLeod further used a quicker and cheaper type of test which cannot differentiate between viable and nonviable mold spores. Mr. McLeod's test results revealed a greater concentration of mold indoors than outdoors. However, the greater concentration of spores such as Aspergillus and Penicillium were found outdoors.
13. Plaintiff also retained Anthony Shankle to facilitate testing of a sample of sheetrock material obtained by plaintiff from an unknown area in the Town Hall and stored for 18 months in a plastic garbage bag. Mr. Shankle has no college or university training and testified at his deposition that answering questions regarding the health effects of mold exposure required ". . .someone more qualified than me." In addition, Mr. Shankle has no knowledge regarding the health effects of the molds Cladosporium or Penicillium, the two most prevalent mold species found on the sheetrock sample. Mr. Shankle sent the sheetrock to a laboratory for testing which revealed potential colonization of Cladosporium and Penicillium mold.
14. After weighing the totality of the competent and credible evidence, the undersigned, in their discretion, afford greater weight to the testimony and findings of Dr. Tulis than to the testimony and findings of Ms. Collier, Mr. McLeod, and Mr. Shankle
15. At her deposition, Dr. Jarvis testified that, in her opinion, it seemed that plaintiff's occupation placed her at an increased risk of developing a sinus condition and rhinitis. However, Dr. Jarvis admitted that rhinitis is one of the most common ailments in the United States. In addition, Dr. Jarvis has no idea how much mold, if any, plaintiff has been exposed to and has never seen plaintiff's office. Dr. Jarvis also cannot interpret the air quality studies performed in this case. Dr. Jarvis made assumptions when forming her opinions based entirely upon plaintiff's report that allegedly there was "frank mold" and visible mold growing in her office in October 2006 and August 2007, which is contrary to plaintiff's hearing testimony and the evidence which shows plaintiff last saw mold in her previous office which she moved out of in September 2006. Therefore, the undersigned, in their discretion, find that although Dr. Jarvis is credible, the foundation underlying her opinions is based on inaccurate assumptions and, therefore, her opinions are afforded little weight.
16. Dr. Deogun was also asked whether plaintiff's employment placed her at an increased risk of developing a sinus condition and rhinitis and testified only that it was possible. Dr. Deogun testified that plaintiff could have tested positive for a mold allergy based simply on regular daily exposure outdoors. She further testified that plaintiff's main allergy was to ash trees which could be the cause of her symptoms.
17. Based upon the greater weight of the evidence, the undersigned find that plaintiff has not shown that her employment placed her at an increased risk over the general public of developing a sinus condition and rhinitis.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. In order for an occupational disease to be compensable under N.C. Gen. Stat. § 97-53(13), plaintiff must prove that the disease is characteristic of individuals engaged in the particular trade or occupation in which the plaintiff was engaged, that the disease is not an ordinary disease of life to which the public is equally exposed, and that there exists a causal relationship between the disease and the plaintiff's employment. N.C. Gen. Stat. § 97-53(13); Rutledge v. TultexCorp., 308 N.C. 85, 93, 301 S.E.2d 359, 365 (1983). Fann v. BurlingtonIndust., 59 N.C.App. 512, 296 S.E.2d 819 (1982).
2. A disease is characteristic of a profession when there is a recognizable link between the nature of the job and an increased risk of contracting the disease in question. Booker v. Duke Medical Center,297 N.C. 458, 256 S.E.2d 189 (1979).
3. Dr. Jarivs' and Dr. Deogun's testimony and opinions do not rise above the level of speculation and conjecture. Click v. Pilot FreightCarriers, Inc., 300 N.C. 164, 167, 265 S.E.2d 389, 391 (1980). Thus, plaintiff has failed to show that her employment placed her at a greater risk of contracting the disease than the public generally. Rutledge,supra. Further, plaintiff has failed to show that the employment significantly contributed to or was a significant causal factor in the development of her sinus condition and rhinitis. Hardin, supra.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff's claim for worker's compensation benefits must be, and is hereby DENIED.
2. Each party shall bear its own costs.
This the 20th day of March 2009.
S/___________________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/_____________ STACI T. MEYER COMMISSIONER
DISSENTING WITHOUT A WRITTEN OPINION:
 S/_______________ DANNY LEE McDONALD COMMISSIONER